# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

════════════════

**NO. 03-05-00283-CV**

════════════════

**In the Matter of G. G.**

════════════════════════════════════════════════════════════════════

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT
NO. J-24,890, HONORABLE W. JEANNE MEURER, JUDGE PRESIDING**

════════════════════════════════════════════════════════════════════

## M E M O R A N D U M   O P I N I O N

G.G. was adjudicated delinquent by a jury for committing aggravated assault and aggravated robbery. *See* Tex. Fam. Code Ann. §§ 53.045, 54.03 (West 2002); Tex. Pen. Code Ann. § 22.02 (West 2003), § 29.03 (West Supp. 2005). At the disposition hearing, appellant waived his right to trial by jury and the juvenile court ordered appellant transferred to the custody of the Texas Youth Commission ("TYC") for a determinate sentence of thirteen years. Following a hearing on appellant's motion for new sentencing, the juvenile court reduced the sentence to seven years. In one issue, appellant challenges the legal and factual sufficiency of the evidence to support the disposition. Finding that the evidence was sufficient, we affirm the order of disposition.

## FACTUAL AND PROCEDURAL BACKGROUND

On July 17, 2004, Kyle Miller[1] was violently assaulted by four men in his apartment in Austin. After the attack, the assailants removed property from Miller's home. Miller identified the four assailants as appellant, Darren G. (appellant's older brother),[2] Donald Bockman, and Shawn Regan.

On the evening of the assault, a Saturday, the assailants went to a gay bar in downtown Austin. Miller testified that he arrived at the bar around 1:30 a.m. and was approached by Bockman, who pinched his nipple and told him that he was cute. Miller testified that soon after, while he was on the bar's outdoor patio, he was approached by Regan and persuaded to join Regan and Bockman back inside the bar. The three conversed until around last call, just before 2:00 a.m. As the bar was closing, Miller invited Bockman and Regan back to his apartment. When Bockman told Miller that he and Regan had arrived at the bar with two other men, and asked if they could also come to his apartment, Miller agreed.

Soon after arriving at his efficiency apartment, Miller was assaulted in the living room area. According to Miller's testimony, the assault began when Regan struck him in the back of the head with a drinking glass. Miller testified that when he attempted to leave the apartment, Darren blocked the front door. Miller testified that Darren pushed him to the floor, and told him, "You

---

[1] "Kyle Miller" is a pseudonym used to protect the victim's identity. *See* Tex. Code Crim. Proc. Ann. art. 57.02(b), (f).

[2] *See* Tex. Fam. Code Ann. 56.01(j) (West 2002) (neither the child nor his family shall be identified in an appellate opinion).

2

better stay down or it's going to get worse." Miller testified that when he tried to stand a second time, Darren hit him in the face "hard enough to draw blood." Miller testified that all four men were in the living room at the time.

Miller testified that Darren then asked Miller if he had AIDS and if he was a "faggot," and accused Miller of inviting the then sixteen-year-old appellant back to his apartment to have sex with him. Miller testified that when he denied that he intended to have sex with appellant, Darren responded, "That's exactly what you did. And you just invited also four Nazis into your home, and we're here to pass judgment on you." Miller testified that Darren asked Miller if he had read the Book of Leviticus and then quoted Leviticus 20:13, telling Miller, "Put to death any man who lies with another man as he would with a woman." Miller testified that Darren then added, "And we are here to pass judgment on you for being a queer." Miller testified that the other three men appeared amused as they stood in the living room watching the beating.

Miller testified that during the assault appellant and Bockman went into his bedroom and returned with swords and knives from Miller's collection. Miller testified that appellant pointed a Japanese-style single-edged sword at him and poked and threatened him with it. Miller testified that when appellant threatened him with the sword, Miller feared serious bodily injury or death. Miller also testified that, after another trip into his bedroom, appellant and Bockman found two sexual devices and brought them into the living room, and that appellant hit Miller on the head with one of them. As the attack continued, Miller testified that Bockman choked him until he briefly lost consciousness.

3

Miller testified that as he sat in a fetal position, pinned between Darren and a large piece of exercise equipment, Darren demanded that Miller take off his clothing and insert a sexual device into his anus. Miller testified that all four men gathered around him as he inserted the sexual device. Miller testified that, after the sexual device was fully inserted into his anus, Bockman attempted to restrain Miller by tying Miller's wrists with a cord from a vacuum cleaner. Miller testified that as Bockman did this, appellant "stood with his foot on my head, holding my head down on the ground."

Miller testified that appellant found Miller's prescription sleeping pills and suggested giving him some "to knock him out so that we can leave." Miller testified that appellant gave him three sleeping pills and a glass of water and said that "three should be enough to knock him out." Miller's regular dosage was one-half a pill or one whole pill. Miller also testified that appellant used a wet paper towel to wipe fingerprints off of surfaces in the living room.

The four assailants subsequently departed, taking some of Miller's property, including his driver's license, some of his swords and knives, and cash. Miller testified that, upon leaving, Darren threatened, "we have your driver's license so we know where you live. We have your picture. We know what you looked like, how to find you, and we've already paid a friend of ours $1,000 to come and kill you if you report this to the police."

Afraid that the assailants might be waiting outside his apartment door, Miller climbed down to the ground from his second-floor balcony and fled to the home of a friend who lived nearby. From that location, an ambulance transported Miller to South Austin Hospital. After treatment in the emergency room for injuries all over his body, Miller was examined by a sexual assault nurse

examiner, a registered nurse with advanced training in the care and treatment of sexual assault survivors.

After the assault, the police found blood on the wall and door of Miller's apartment and on the jeans and white shirt that he had been wearing that night. They found a vacuum cleaner with its cord cut off, a slashed mattress and curtain, and a painting of two men that had stab marks near the penises, mouths, and chests of the men depicted. The police also found a sword that had been left in the kitchen by the assailants. The police subsequently determined that a fingerprint left on the sword belonged to appellant.

Appellant and Darren testified for the defense, and both denied that Miller was sexually assaulted. Darren testified that he and Bockman struck Miller only after Miller licked appellant's ear and that appellant did not hit, kick, or yell at Miller. Appellant testified that he never threatened or hit Miller and that he was not involved in the decision to take Miller's property.

The jury found that appellant had engaged in delinquent conduct by committing the offenses of aggravated robbery and aggravated assault but was unable to reach a decision regarding the charges of aggravated sexual assault. The juvenile court declared a mistrial as to those allegations but accepted the other verdicts returned by the jury.

At the disposition hearing, appellant waived his right to trial by jury. After receiving evidence and argument from both parties, the juvenile court imposed a determinate sentence, ordering that appellant be removed from his home and committed to the care, custody, and control of the TYC for a period of thirteen years. At a hearing on appellant's motion for new sentencing the court reduced the term of appellant's determinate sentence to seven years. This appeal followed.

5

## ANALYSIS

In a single issue, appellant contends that the evidence does not support the three determinations made by the juvenile court pursuant to Texas Family Code section 54.04(i)(1) during the disposition phase of the trial: (1) that it was in the appellant's best interest to be placed outside his home; (2) reasonable efforts were made to prevent or eliminate the need to remove appellant from his home; and (3) appellant, in his home, could not be provided the quality of care and level of support and supervision that he needs to meet the conditions of probation. *See* Tex. Fam. Code Ann. § 54.04(i)(1) (West 2002).

### *Standard of review*

The juvenile court is permitted to commit a child to the TYC if all three of the determinations outlined in Texas Family Code section 54.04(i)(1) are met. *Id.* The family code does not require the court to explain the evidentiary support for the conclusions in its order. *In re M.S.*, 940 S.W.2d 789, 792 (Tex. App.—Austin 1997, no writ).

The juvenile court's findings are reviewable for legal and factual sufficiency. *In re C.C.*, 13 S.W.3d 854, 858 (Tex. App.—Austin 2000, no pet.). To determine whether the evidence is legally sufficient in a juvenile case, this Court applies the criminal standard of review: "We view the evidence in the light most favorable to the finding and determine whether any rational trier of fact could have found the elements of the requirement proven beyond a reasonable doubt." *Id.* (quoting *In re M.S.*, 940 S.W.2d at 791-92). In reviewing factual sufficiency, we consider and weigh all of the evidence, and if the finding is so against the great weight and preponderance of the

6

evidence as to be manifestly unjust, we set aside the disposition order and remand the case for a new disposition hearing.  *Id.* at 859.

**Appellant's removal from home**

Appellant contends that, because he committed his only crime while living away from home and was well-behaved while on release before and after the adjudication phase of the trial, it was not in his or the public's best interest to remove him from home.  Appellant's contentions are contrary to the juvenile court's findings in its amended commitment order that appellant's removal from home was in his best interest, and that in his home he could not be provided the quality of care and level of support and supervision that he needs to meet the conditions of probation.  *See* Tex. Fam. Code Ann. § 54.04(i)(1).  The court did not provide an explanation for its conclusions in the order.  *See In re M.S.*, 940 S.W.2d at 792.

Contrary to appellant's contention, appellant's conduct on release was cited by the court as an important factor in its decision not to grant probation.  As an active participant in a premeditated assault and robbery, appellant was deemed a "danger to society" by the juvenile court. The court further observed that appellant would remain "a risk to the community" until he obtained treatment.  The court found it significant that appellant did not attend counseling during this period despite the encouragement of his probation officer.

The testimony supports the court's conclusion that appellant would not have obtained the proper treatment if he received probation at home.  Appellant had a strained relationship with his verbally abusive, alcoholic father, and had attempted suicide in October 2003 by taking an overdose of anti-depressant medication.  Yet at the disposition hearing, when asked on direct if he

7

needed counseling, appellant testified, "Truth is, I don't think I need it." Although appellant added that he would go to counseling if it was required by the court, his assurance contrasted with the testimony of his probation officer, who testified that appellant and appellant's mother ignored his suggestions that appellant begin counseling.

Appellant's mother was unwilling and unable to make appellant attend counseling. When asked why she did not take appellant to counseling, appellant's mother responded that appellant "didn't want to go to counseling. He didn't feel like he needed to go to counseling." The following exchange occurred between appellant's mother and the State:

| [State]: | So you let your child decide what's the best therapeutic treatment for himself? |
|---|---|
| [Appellant's mother]: | No. [Appellant] is 17 now and he can decide. You know, I can't force him to go into counseling. He's not an actual child. I can't pick him up and force him to go into a place. |

Appellant further testified that, while in his mother's care, he did not follow his doctor's orders regarding the treatment of his Graves' disease, an autoimmune disease that causes overactivity of the thyroid gland. Specifically, appellant stopped taking a prescribed medicine. When appellant was asked how he determined that the medication was no longer necessary to treat his illness, appellant responded, "I really didn't think I needed it anymore. And I decided I was going to try to go without it and see what would happen then." Appellant's mother testified that although appellant "should" be taking blood tests every six to eight weeks, he did not take a blood test for fourteen or fifteen weeks during the summer of 2004. When the court asked appellant's mother why that happened, appellant's mother responded, "we kind of let it go."

8

The testimony also showed that neither appellant nor his mother realized the severity of appellant's actions, tempering the court's hopes that they might change their ways as a result of appellant's adjudication as delinquent. Appellant testified that he had nothing to do with the incidents of that night. When asked if he was willing to take responsibility for what he did, appellant responded, "I'm responsible for what I did, but I didn't do anything." Appellant also showed a lack of remorse. When appellant was asked what he thought the effects on Miller were from the incident, appellant responded,

[Appellant]: Physical abuse—he had a black eye.

[State]: Is that your—that what you think the total effect of what you-all did to him is?

[Appellant]: Well, my brother, yes, ma'am.

[State]: That's it?

[Appellant]: Yes, ma'am.

[State]: Is there anything that you want to tell Kyle?

[Appellant]: I'm sorry for what my brother did to him.

When appellant's mother was asked if appellant was capable of accepting the responsibility for what he did, she testified, "I don't believe that [appellant] did anything."

Appellant's level of care while in the custody of his mother contrasted with the care available from the State. The probation officer testified that programs offered by the TYC would promote appellant's physical and mental well-being. He described the TYC's resocialization program and concluded that it "could probably offer him some therapy that would be able to change

9

his life." The court agreed, stating that appellant would be helped by "the structure, and the treatment modality" at the TYC. Further, the court's authority to commit appellant to the custody of the TYC was not limited by the fact that this was appellant's first contact with the juvenile justice system. *See In re C.C.*, 13 S.W.3d at 857 (juvenile court did not abuse its discretion by committing appellant to TYC for a single, non-violent offense).

We conclude that there was legally and factually sufficient evidence that it was in appellant's best interest to be placed outside his home and that appellant, in his home, could not be provided the quality of care and level of support and supervision that he needs to meet the conditions of probation.

### Efforts to prevent or eliminate the need for removal

Appellant contends that no efforts were made to prevent or eliminate the need for appellant's removal from home. Appellant further contends that by attending school regularly and behaving well at home while on release, he proved that no additional safeguards were necessary for him to remain at home. Appellant's contentions are contrary to the juvenile court's finding in its amended commitment order that reasonable efforts were made to prevent or eliminate the need to remove appellant from his home. *See* Tex. Fam. Code Ann. § 54.04(i)(1).

The record supports the court's determination. The court allowed appellant to remain home while on release, which provided an opportunity for appellant to demonstrate his commitment to bettering himself. Although appellant did well in school and was law abiding during this period, appellant did not seek counseling to address his psychological needs. The probation officer testified

10

that he repeatedly recommended to appellant and appellant's mother that they seek counseling and that they were unwilling to do so.

The statute requires only reasonable efforts to prevent or eliminate the need to remove the child from the home. With appellant and his primary caregiver, his mother, unwilling or unable to address appellant's psychological needs despite the reasonable efforts of appellant's probation officer, the court concluded that commitment to TYC was the most reasonable outcome.

In light of the circumstances of appellant's home life, further efforts to keep appellant in his home would have been unreasonable. Appellant had been living with only his mother in a separate family residence because neither appellant nor his mother could live with appellant's verbally abusive, alcoholic father. And according to testimony from the probation officer and appellant's mother, appellant looked to his brother, who admitted physically assaulting Miller, as a father figure. Appellant told the probation officer that the only person appellant feels that he can talk to about his problems is his brother.

We further note that in the Juvenile Justice Code, the best interests of a child who engages in serious delinquent conduct is superseded to the extent it conflicts with public safety. *See* Tex. Fam. Code Ann. § 51.01(1), (2), (5) (West 2002); *In re J.P.*, 136 S.W.3d 629, 633 (Tex. 2004). In the instant case, appellant committed aggravated assault and aggravated robbery during the commission of a premeditated assault. The court found appellant to be a "danger to society," a "risk to the community," and in need of treatment. In the instant case, probation was not consistent with the protection of the public and, therefore, it was not a viable option.

11

Accordingly, we conclude that there was legally and factually sufficient evidence to support the juvenile court's determination. We overrule appellant's issue.

**CONCLUSION**

The evidence was legally and factually sufficient to support the juvenile court's disposition. We affirm the disposition of the juvenile court.

_____

Jan P. Patterson, Justice

Before Chief Justice Law, Justices Patterson and Pemberton

Affirmed

Filed: July 21, 2006